Good morning, and may it please the Court, my name is Jane Fleming, I am with the law firm of Reed Smith, and I am pro bono counsel for the petitioner Raoul Akhtenoff. Thank you for taking the case. You're welcome. This is a petition for review of a Board of Immigration Appeals decision, and it's important to note that the Board did not adopt any part of the underlying immigration judge's decision, so that decision is not part of the denial of asylum and withholding of removal that is before this Court. The Board based its denial of Akhtenoff's asylum and withholding claims on two grounds. First, the Court held that the beatings and detention and threats that Mr. Akhtenoff suffered at the hands of KNB security officers in Kazakhstan did not constitute persecution on account of an enumerated ground, but rather was a legitimate prosecution for insulting the dignity of the President of Kazakhstan and participating in a political opposition rally. Second, the Board found there was no evidence showing that the KNB officers who beat and detained Mr. Akhtenoff did so because of his mixed ethnicity or political opinion. The Board's first finding is impossible to square with legal authority, and the Board's second finding is impossible to square with the record. I'm going to work in reverse order and begin with the record. Akhtenoff presented testimony and evidence demonstrating that university officials at his university and KNB security officers worked hand in hand to protect an ultra-nationalist ideology in Kazakhstan and to silence opposition to the President's dictatorial regime. When Akhtenoff and four other minority students at his university challenged that nationalist ideology and attempted to form a student group aimed at protecting minority student rights, the university silenced them, prohibited their group, and turned them over to Kazakhstan's security police. The Kazakhstan security officers explicitly stated that they were punishing Akhtenoff because of his political activities and they used ethnic slurs while they were beating him during his detentions. That evidence alone is sufficient to compel the conclusion that Akhtenoff was persecuted on account of an enumerated ground. The officers called him a stubborn opposition dog and a traitor while beating him. Officers, and that's at the administrative record pages 86, 88, and 241. The officers told Akhtenoff that his, quote, actions, not just his words, were against the President of Kazakhstan. The record pages 88 and 241 again. The officers warned Akhtenoff to stop his political activities or leave the country. If this was a legitimate criminal prosecution for insulting the dignity of the President, why would the officers tell him to leave the country? Why would they not file criminal charges? Why would they beat him while he was under detention? This is clearly a case of persecution on account of political opinion, not a legitimate prosecution. The KNB officers' beatings were coupled with ethnic slurs. The officers screamed at Akhtenoff while beating him that, quote, Germans, Jews, Russians, and all bastards who originated from them should not live in their country. That's at the administrative record pages 88. The board also ignored that evidence. In fact, it makes no mention of that evidence in its decision, yet it compels the conclusion that he was persecuted in part because of his mixed ethnicity, half German and half Kazakh. Turning to the board's alternative finding that beatings and warnings to leave the country constitute a legitimate prosecution, the board overlooked two critical legal points. First, when a government punishes an individual under a law aimed at extinguishing political expression, that punishment constitutes persecution, not prosecution. The Third Circuit's decision in Perkovich at 33 Fed Third 615 is on point, and this court's decision in Singh v. Ilkert is also controlling. That's at 63 Fed Third 1501. In this case, the State Department country condition reports show that the Kazakhstan government used the law against insulting the dignity of the president, and they used the law against unsanctioned political rallies to persecute political opponents of the government. That's at the administrative record pages 54, 55, and 58. Finally, this court's authority and the authority of the Third and Sixth Circuits teach that evidence of punishment out of proportion to law enforcement goals is circumstantial evidence that the punishment may be a pretext for persecution on account of an enumerated ground. Here, Akhtenov was never charged with any crime. There was no legitimate investigative purpose behind the beatings or threats. The K&B officers made plain their motive to punish Akhtenov on a basis of a protected ground. The only issue that this court really needs to decide today is what to do with this case. Is the court now in a position to find that Mr. Akhtenov is statutorily eligible for asylum and remand solely so that the government can make a discretionary determination about whether he is eligible or is there more to be done below? Our position is that this court should find him statutorily eligible for asylum. There are three arguments that the government raises in terms of what remains to be done. First, were the beatings persecution? Did his experience rise to the level of persecution? The government did not brief that issue or raise it before the Board of Immigration Appeals, so it is waived. It cannot go back and have a second fight at the apple. With respect to whether or not Mr. Akhtenov has a well-founded fear of future persecution, we know that once the court finds that he has established past persecution, there is a rebuttable presumption and the government needed to put on evidence showing that he could safely return to Kazakhstan. There is no such evidence in this record. So, again, under this court's authority, there is no need to remand on that issue. The specific case is Bavala, which is Site 367, Fed Third 1067. Credibility. Does the court remand on the issue of credibility because the BIA addressed a legal issue? No. The BIA basically said, even if we deem Mr. Akhtenov to be credible, we find that he didn't satisfy the nexus requirement. This Court's authority basically says when the BIA is silent on the issue of credibility, you presume he is credible. But that wasn't silent. It said specifically that it wasn't going to get to the issue. So it wasn't silent. It was saying, assuming credibility, we find that. So if it goes back, then they have to determine the issue, was the Petitioner credible or not? Well, we're prepared to fully defend the credibility finding, and if it goes back, I am positive that we will defend that finding. Your Honor? I admire your honor, but we have to determine what we're going to do with the case. Right. And I don't think — I have difficulty following your argument that the BIA didn't discuss credibility. I think, in fact, they specifically said they weren't going to discuss credibility. They go ahead and assume credibility for the purpose of how they want to handle it, which I thought was a fine way to do that. But that doesn't mean they waived it, does it? It's not really a waiver argument, and I'll be candid in saying that the rule that I'm asking the Court to use this case to announce is basically a rule that is not expressly stated in an opinion. The position, Judge, that you're articulating is basically the dissent in the Maldonado-Cruz case, which basically says this is sort of like a demur, where the judge resolved it, the BIA resolved it on a legal ground. We now have to go back and sort out some factual issues. But the proper rule in this case, and I think it's permissible under Ventura, is basically to say, unless the BIA expressly reserves the credibility issue, then it should not be permitted — the government should not be permitted to go back and have a second bite at the apple as to that issue, and the Board should not be permitted to resolve cases in this piecemeal fashion. It results in delay for my client. It results in judicial inefficiency. And the Board deemed him credible for purposes of resolving this case. What you're saying is that we should order the Board never to do this. They have to discuss both credibility and its application. We shouldn't allow them the option of doing that. Do you have a case where we've actually directed the Board? I sort of thought that was an administrative agency, and they handled their own way of doing things. That's true, Your Honor. I think that the rule that would be appropriate, as I said, no, I don't have a case that basically says this is how you do it. But the rule, the direction, the set of directions that you would give the Board is essentially, if you want to expressly reserve the credibility issue, say so. If you don't say so, we're going to presume, just like you did with credibility and silence on credibility. You said if you don't say anything about it, we're going to presume it. Silence is somewhat different from the circumstance when they say we're going to assume, we're not going to reach this issue. We know it's out there, but we're not going to reach it. And assuming credibility, here's our finding. Why isn't that enough for the Board to say we've reserved the issue? I mean, I take your point when the Board says nothing. Mm-hmm. But when the Board says we know that the issue is out there, we're not going to reach that. I had an occasion recently to have a clerk research how many times in the last Supreme Court term the U.S. Supreme Court used the phrase we assume without deciding. It was in the hundreds. Well, this Court didn't say we assume without. The V.I.A. didn't say we assume without deciding. They say even if we deem him credible. Now, I admit, they didn't reach the issue. It's possible. You know, if there's a remand on credibility, we go back, we resolve the credibility issue, we may be back here in two years. Sure. I mean, of course it's inefficient. But on the other hand, if we force the V.I.A. to reach every issue and every case when they recognize the issue, that has its own cost administratively, too. We've taken over your time. Thank you for your argument. Thank you. We'll hear from the government at this time. Again, thank you so much for your indulgence. I'm very grateful, very appreciative. Norah Schwartz for the government. I do have a case that says you don't have to reach every issue as long as one is dispositive, and that is Bagamasbad, and that's a United States Supreme Court case. So the Court, the Board was not required to reach credibility because they decided it on the merits. What happened to this kid was horrible, and we wouldn't condone it here, but it was not persecution on account of a political opinion imputed or actually held. What happened was he got annoyed because, believe it or not, the president of the country didn't write back to him when he said, I wanted to start an organization and my university wouldn't let me. And because the president did not respond to this letter, he wrote, he posted posters all over the university saying he's a dictator, he's a Stalinist, he's a little Hitler. What difference does it make what happened that led up to that point? The difference is what happened, why. If he simply woke up in the middle of the night and said, tomorrow morning I'm going down to Northern Kazakh University and I'm going to put up posters critical of Nursultan Nazarbayev and point out what a dictator he truly is, and what happened happened. How would that be different? Because that kind of speech is controlled in Kazakhstan. You can criticize the president, but you can't use slanderous terms. That is restricted. Sort of the Kazakh version of the Alien and Sedition Act? Something like that. We don't know what would have happened if he just put up posters that said we weren't entitled to register our organization and were upset about it. A poster that said, I don't think this guy was legitimately elected. It's possible. It was the slander issue that the State Department says. How did he slander? Mini-Hitler, mini-Stalin, dictator, coward. Does the statute say you say slander? I believe it's – well, the State Department – I don't know what the statute said, I don't speak Kazakh, but the State Department – Mostly they speak Russian. Okay, well, I wouldn't speak that either. But the State Department report said it restricted criticism. My understanding was it said that you weren't supposed to disparage the president. And we don't know to what level disparagement can be carried from this case, but we know he carried it too far, and I don't think there is a question that calling him a mini-Stalin, a mini-Hitler, a coward, would violate that law. There's a great old story about the conversation that supposedly went on between Ronald Reagan and Mikhail Gorbachev, and President Reagan was explaining what the First Amendment in the United States meant, and he said it means that any citizen in the United States could walk in the Oval Office and say, President Reagan is an idiot. And that's not a crime, there's nothing wrong with that. And Gorbachev says, well, we have that right in the Soviet Union. Any citizen can walk right in the Politburo, come right in my office, and say, President Reagan is an idiot. Well, that's a little bit different here because this is the sitting president. Well, there are a lot of countries that have similar statutes. There's even some that have them for slandering judges and they put them in jail, something that perhaps we may want to get to. As well they should. Be that as it may, we accept the credibility of the petitioner, and so if in fact this was prosecution for disobeying laws, even though we may not agree with the laws, you have a strong argument. The problem that I've had with the case is on page 246, and we accept this as credible, answering the question, well, after they finished beating me up, one of the investigators told us that we, with all the activities we make, we basically either need to stop it or get out of the country. Now, I got your argument pretty well up to that, and maybe you could justify some of the other activities that took place, as in either a prosecution or investigation towards a prosecution in line with Deneuve. But how do you justify if in fact it is a criminal prosecution, that they're telling them you either stop doing what you're doing or get out of the country? That doesn't sound to me like what people do. The investigators representing the government don't say you're a criminal. Leave. It strikes me that what happened here, if we have to accept this, which we do, that it demonstrates that this was not a criminal prosecution. How do you respond to that? Except for, well, it wasn't a criminal prosecution. It was an interrogation. They brought him in, they beat him up, and they said, give us the names of the other students. He gave them the names of the other students. They stopped beating him. Also, they did not beat the other students because they had no proof that they were involved in posting the posters. So, I mean, there is some kind of reality check. They're not going around beating up everybody. But when they say, I mean, people say it here. It's an ugly thing to say. But, you know, people who are saying, well, we want rights for aliens, my office overlooks Liberty Plaza, and there are demonstrations all the time. And recently there's been one for immigrants' rights. And there are people who — Let me answer my question. My question is, specifically, if the prosecutor representing the prosecution, the government, says stop this or we'll continue to beat you unless you leave the country. This was — That is not — that does not sound like to me that they're there because they committed a crime. You don't tell people to leave the country if they committed a crime. You put them in jail. Well, his — this isn't the prosecutor. It's the guy who's been beating him for two hours. And he says — and he's saying, well, this is my ethnic minority thing. And he said, well, if you don't like it, go home. He's not saying we're requiring you to leave. And, in fact, after the demonstration — I just read from the transcript. You're sort of characterizing, aren't you? I am characterizing. But what he's saying is, basically, not the precise words, but he's not saying you're going to have to leave if you don't stop. I mean, these are the words he used, but the point is, it's like, you don't like it here, go home. And the thing is, he wasn't stopping anything he wanted. All he wants is — he wanted a group of ethnic minority students to have their rights. But, first of all, all the other students went home. And, second of all, I'm not sure what his personal problem was, because his sister and his brother are obviously of the same ethnic origin, and they never — I don't think you're getting to my question at all. Which is — let me go back to the word. I do apologize for that. 264 or 246? It's at page 246 of the excerpt. It's at the top of the page, and it's his response. The response of what they told him after they had beating. If they want the beatings to stop, you leave the country. Or you stop the activities. It says, with — they told us that we, all the activities we make, we basically either need to stop it at all or get out of the country. You need to stop the activities? Suppose it was a bank robbery. If a bank robber was in there, the police wouldn't say, stop robbing banks or get out of the country. They'd put him in jail. If, in fact, he was being beaten for political reasons, they might well say either stop your political activity or get out of the country. But I don't think that I have difficulty justifying that language, that it's anything other than political activity, if they're not going to prosecute him for what he did, but they're going to let him leave the country. That's the problem I have. Maybe you can justify that, and that's why I wanted you to respond. I'm sorry, Your Honor. That's why I wanted you to respond. That's the problem I have with the case. Well, that's not — there is no justification for that. However, the fact is they did release him. They did nothing to throw him out of the country. I believe they called a few days later and they said, you've got to leave the country. That's right down the next part of the page. A few days after I was released, the questioning, they said, I got a call from the investigators who told me that I needed to leave the country because they would not leave me alone if I didn't. But then you get to empty threats. He stayed in the country for three months after that, and nothing happened to him. Well, we're talking about whether this political activity, you're shifting. I don't mean to. I know you don't, and it's natural because you're responding. But I think the central point is you look at these things objectively from the point of view of the government. It looks like all the objective evidence would seem to indicate they thought this was political speech and he needed to stop or get out of the country, if you deem him credible, which the board did. Yes. Assuming he is credible. And they actually told him this, which we have to believe because he's credible. The point is they say you stop the activities or leave the country. But the point is there was no indication that there were teeth to this threat. I mean, it does. It's objective evidence that they considered this a political speech rather than a criminal activity because you have to mean that to win this you have to say, well, this is a legitimate law enforcement activity. And it doesn't sound like legitimate law enforcement activity. You say, well, you get out of it, stop it, or get out. And it's then somebody does get out. Well, yes, but that's assuming that they conduct themselves in conversation as well as in physical control over the person the way we would expect them here. We don't expect our police officers to say to persons they arrest who are violating a law who are not citizens or lawful residents to say, look, why don't you just go back where you came from. But they do say it. And this is what they're saying here. They're investigating him for two separate political incidents which may have violated the law. And he does one law. He said he didn't know that which existed. The other one, it was a demonstration which he didn't think had a permit. So he was being beaten for that. It was ugly. But the beating stopped when he gave them the information they wanted, which is what's the organization like. And it's an anti-government organization. The fact that a police officer, while getting the information, says, well, if you don't like it, just leave, or we're going to make you leave, doesn't make it. I mean, it's unpleasant. It's ugly. If you don't like it, leave. This isn't, you know, Kazakhstan, love it or leave it talk. It's stop it or leave the country, or then the follow-up, or we're going to continue to be after you. That is one reading of it. I don't think the facts compel that. Well, we understand your argument and your position. I'm sorry if I haven't convinced you. I thank you, so then I'll go back to the Ventura argument. And I thank you, Your Honors, and thank you again for your indulgence. Not a problem. Thank you both for your argument. The case just argued will be submitted for decision, and we'll stand and recess for the day. All rise. As I said, I knew you would get it, though. I knew you would get it. I knew you would get it. May I go first?
judges: Wallace, Hawkins, Thomas